Hey, please the court. My name is Leticia Marquez, and I am an assistant federal public defender with the District of Arizona. I, along with Sylvia Lett, represent Mr. Jones in these proceedings. Are you related to Alfredo? Very far removed. Okay. If you're anywhere close to him, it's okay. This afternoon I'd like to spend my time discussing the issue surrounding the evidentiary hearing that took place in the district court. The district court granted an evidentiary hearing on the issue of ineffective assistance of counsel at the sentencing phase. We have raised in our issue the several errors that the district court committed in denying relief, evidentiary hearing relief for Mr. Jones. And I'd like to start with the Tenard error that is throughout the district court's opinion. The district court, in violation of Tenard, well, Lockett, Eddings, Tenard, and Abu-Kabir, as well as this court's opinions in Stiers and Lambright, committed Tenard error by imposing a constitutional relevance test to the mitigation presented at the evidentiary hearing. And I'd like to point out some of those constitutional relevance tests that the district court applied. First, in our post-traumatic stress disorder mitigation, mitigating factor, the district court held that Mr. Jones failed to establish a nexus between the abuse and the murders. When it comes to the ADHD diagnosis, the district court held that based on Dr. Shealy's testimony, that the district court found that particular mitigating factor unrelated to the violent behavior. When it came to the mood disorder NOS, a serious mental illness, the district court held that there was no causal relationship between the condition and the crime. In denying our claim that the trial court, I'm sorry, that the trial counsel failed to seek neurological testing, the district court held that the ADHD and any other chronic conditions revealed by neurological testing only would have revealed that they were not causally connected to the crime. And therefore, Mr. Jones was not prejudiced. In denying our claim, our 20P claim, I'm sorry, 20T claim, the district court cited a lack of causal connection between the potential or the abuse from the second stepfather and the severe sexual abuse from the stepgrandfather. Again, dismissing it as lacking any causal connection. Now, this court has held that many of the mitigating factors that we have outlined and that we presented to the district court in our evidentiary hearing constitutes classic mitigation. This court held in corral, as the Supreme Court has consistently instructed, these kinds of claims constitute classic mitigation, which a fact finder must consider when deciding between life and death. The district court, in violation of Supreme Court precedent and this court's precedent, denied those claims. If we, the panel, were inclined to grant relief as to sentencing, that's if, hypothetically, and the state held a rehearing, would it be an open record? I'm sorry, I don't understand. Well, would the state be able to put on any evidence it wished to put on, in addition to the evidence that your client, you and your client, thought relevant? You mean in rebuttal type? Yeah. Your essential argument, as I understand it, on mitigation is that counsel was inadequate, insufficient mitigation evidence was put before the state superior court at sentencing, and if the full story, if the full plate, if you will, of mitigation testimony had been available, there might have been a different result. Right. Is that essentially right? Yes. So if we were to agree with you and grant relief, and the state court held a resentencing hearing, if you will, would it be an open record? Yes, Your Honor. So you'd be able to present what you wanted, and the state would be able to present what it wanted? I would believe so. Okay. All right. Just in terms of the mitigating factors, assuming all of what Judge Hawkins said hypothetically would occur, what additional non-statutory mitigating factors would you urge? I can articulate. I understand your evidence, but, I mean, in that, let me go ahead if you don't mind. Go ahead. In this case, the trial court found substance abuse, chaotic and abusive childhood, influence of drugs at the time of the accident, and possible head trauma and other abusive factors. And reading between the lines of the district court order, it seemed to me that Judge Bolton was saying, well, all of your new evidence is subsumed, perhaps, into the factors, the non-statutory factors that the trial court already found. So my question is, are there additional factors, not evidence, that you would urge if you were allowed to go to resentencing? Well, I don't know if, I mean, I could try to parcel them out into additional factors, but I think what's important in this case is that are the details of what was presented in the district court. So I gather that, I mean, I gather that your argument really is on the weight of evidence to the factors that are probably already in the record rather than additional factors themselves, right? Well, the additional, there are additional factors that were not presented to the trial court, such as the post-traumatic stress disorder and the ADHD and diagnosis of brain damage. And so those are additional to what was presented originally to the trial court. Now, there was chaotic childhood. That was a mitigating factor that was presented. And the district court found that it was cumulative. But the information that we provided, the new information, is much more detailed, much more extensive. And Dr. Stewart presented it in his 33-page report and in his testimony in a clear and interwoven way, as this court has held in many cases, that the mitigation information has to be presented and explained. It's very different than what was done at the trial court. The trial court, the trial lawyer just listed off information, put Dr. Potts on the stand, who repeatedly said he didn't diagnose Mr. Jones with any of this. He conducted very limited investigation because he considered himself a neutral, court-appointed expert. Right. I guess where I'm heading is that in many of the Arizona cases, we have an absolute failure to present any mitigating evidence. That wasn't the case here. And, in fact, the sentencing judge found by a preponderance of the evidence that at least four mediating factors existed. The evidence you want to put on would bolster some of those factors, and I suppose arguably you could have additional factors, but the outlines of the mitigation defense were certainly there. We would argue that it would do much more than bolster. This case would be, as this court has held in Beaumonties, the factors that were raised, not diagnosed, but raised by Dr. Potts in the trial court amounted to tantalizing indicators of suggesting that there may be more mitigation in the record. I can give you an example of there was information in the trial, presented to the trial court, that Mr. Jones was first introduced to drugs and alcohol by his step-grandfather and his uncle. Now, that is a tantalizing indicator that there's something very wrong with this grandfather and uncle that introduced him to this. And, as it turns out, when we dig deeper, as this court has held in Douglas, there was a very sadistic motivation behind the introduction of drugs and alcohol to Mr. Jones. Well, comparing what was before the state court at sentencing and what was put on at the evidentiary hearing that Judge Bolton and the district court conducted, at the sentencing hearing there was certainly evidence that your client had an abusive childhood. He had been abused by a stepfather and others. There had been some incidents involving head injuries and the like. What Judge Bolton determined was that the additional information you put on might expand the nature. In other words, at the state sentencing, it might have been shown he had an abusive childhood. With the evidence that was put on before the district court, you would show that he had a really, really abusive childhood. But she said one was subsumed into the other. Was that wrong? Yes, Your Honor. Tell us how that was wrong. Well, it's wrong because, in part, Judge Bolton did not consider all the information because of the Ternard error. But besides the Ternard error, Judge Bolton minimized many of the mitigating factors. There is new information. For example, the traumatic childhood. We now know that it wasn't just the first stepfather that abused Mr. Jones. It was the second stepfather as well. So the abuse didn't end at age five. It continued on until he left his home. That, we assert, is not cumulative. It's not the same. It's additional. It went on throughout his life until he left his home. Also, the drug abuse. This court has held in Belmonte's and has also acknowledged in Silva that there is ‑‑ has acknowledged self-medication. Well, it's really different to present to a trial court that this guy is a drug addict than to say, he's using drugs to self-medicate against a very traumatic childhood that has a whole host of traumatic events. So the quantity and quality of the mitigation is different. If you were to put it in categories, sure, many of it goes into the very different categories. But it's ‑‑ the devil's in the details, I suppose, as this court has held. I mean, you didn't hold that. But as this court has acknowledged in Stankiewicz. In Stankiewicz, there were six people who got up and testified as to mitigation, but the details weren't drawn out of the mitigation. And so if somebody ‑‑ this court held that that was not enough. You can't have bits and pieces and bare bone mitigation. It has to be presented and explained to the trial court, which is what we did in front of the district court. Well, one of the things that was different about what was presented in the state trial court and in the evidentiary hearing before Judge Bolton is the fact that Randy Jones, the second stepfather, himself had abused your client. Is that correct? Yes, Your Honor. And was that information available at the time of the state sentencing? Well, there were tantalizing indicators of it, and Mr. Novak failed to follow up on that. How was that unearthed, that not only was there abuse by the second stepfather, but the very person the defense attorney was relying upon to describe the earlier abuse was in fact an abuser himself? We talked to the sister. And she's the one that first told us about the abuse. And then it went on from there. You talked to Mr. Jones, confronted him with the information. I mean, without getting into how it all works, I mean, that's really how it starts. That's how capital mitigation investigation starts. You talk to everyone, and then you move forward from there. And ultimately, we had cooperation. It wasn't self-report from Mr. Jones. We had cooperation from the sister. And when Dr. Stewart talked to Mr. Jones' second stepfather, he admitted the abuse. So, you know, the fact that the district court was clearly erroneous when it dismissed this information as either self-report or, you know, cumulative or any of that. This is very different and paints a very different picture of Mr. Jones' life than what was presented at the trial court. If I may, Your Honor, I'd like to go through the list of what is new and how it's influenced. Or how it changes the picture of Mr. Jones. There is four very solid scientifically-based mitigating factors. And what Dr. Stewart did is under those different factors, then there's other mitigation that supported it. The first that he found was cognitive dysfunction, which is brain damage. He went through four experts' reports, met with Mr. Jones, reviewed school records, interviewed him regarding head injuries and drug abuse, and substantiated that there are some deficiencies, some brain damage, with neurological testing done by Dr. Goldberg. And he found that Mr. Jones suffers from brain damage. Along with the independent brain damage that comes from head injuries, he also found post-traumatic stress disorder. He found the trauma and ran through both the complex criteria and the DSM-IV criteria to diagnose Mr. Jones. Your client had been in the military, hadn't he? Yes, he had, Your Honor. How long? He didn't make it too far. He made it after boot camp and then shortly after that got himself in trouble. And it was during the military where he suffered a pretty severe head injury. The district court was clearly erroneous when it decided that this particular head injury wasn't really a head injury at all. The district court relied on a face sheet and an intake sheet where emergency medical personnel arrive on the scene and they have to address what they observe, and so appears to be sleeping, unresponsive, that type of information. If the court and the district court ignored more detailed medical records from the military where his release diagnosis was first head trauma, then intoxication, and then resolved concussion. Now, another important fact is that he was released to two days' convalescent care and one week of light duty. Now, the military, especially the Marines, would not have released Mr. Jones to that type of duty were it just a hangover, as the district court in Dr. Shalley characterized this head injury. He was ultimately discharged from the service? He was, Your Honor. For what reason? He was discharged for, I believe it was stealing or suspected of stealing from people that he was in group therapy with. And, in fact, it was in this group therapy where he discussed or referenced his painful childhood memories. And so even though that may have been, as the district court says, that the trial lawyer didn't introduce that evidence because it could cut both ways, actually that information was important because he referenced his childhood trauma. He wasn't discharged because of psychological or medical problems? No. I don't believe so. So there was no naval hospital diagnosis related to that? No. But we have naval hospital records relating to the head injury. And if I may note that there was some insinuations from Dr. Shalley at the evidentiary hearing that Mr. Jones was drunk and most likely high, if the trial court would have looked at these records, it would have noted that there were drug screens done, and he tested negative for all the drugs that they did with that particular incident. What is the evidence, the additional evidence, that you would argue should undermine our confidence in the result of the sentencing in state court? Are you asking me to pick one mitigating scenario? Whichever, whatever number you would like and whichever order you would like. Your Honor, I honestly cannot pick one mitigating factor. All the evidence that we presented in the district court is the full picture of Mr. Jones' history and life and genetics and, you know, all his experiences that made him the person he was on the day that he committed the crime. You think an Arizona jury at this, if it were, went back for resentencing, it would be a jury, wouldn't it? Yes, Your Honor. You think an Arizona jury would weigh that evidence against the two brutal murders that happened here and conclude that life sentence is more appropriate than capital sentence? Well, we have a good idea of what this particular jury found. We included in the last excerpt of the record with our supplemental reply brief, two juror declarations that we uncovered and we actually submitted those were really for to support the second suspect claim. But two of those jurors found or two of those jurors were of the opinion that Mr. Jones did not deserve death for these crimes and one actually believed that he did not commit the crime alone. So we have, these are jurors that sat and decided the guilt innocence phase of Mr. Jones and so we do have more than speculation here that there were two jurors that would not have decided death in this case. Sorry, I forgot to, in the beginning of my argument. You don't need to apologize. You can use your time as you wish and save it as you wish. Okay. Well, I'd like to reserve five minutes for rebuttal, so. We'll try to remind you when you have five minutes. Sorry. We'll try to remind you. Okay. Thank you so much. I would like to run through, though, what is new just so that the court has a good picture of what is, that this in fact isn't cumulative. There is also more information about Mr. Jones' drug abuse. As I mentioned earlier, there was, there's information that Mr. Jones, you know, the reason behind and the motivation as to why he started using drugs is now put into context as he wasn't just a druggie and a user. Also, there was more information about more relatives that had addictions and complexes and disorders. And so that has put Mr. Jones' drug use in context. Also, the hand injuries and brain damage, no one at, the trial lawyer didn't ask Ms. Jones about prenatal, the prenatal, sorry, her, how her pregnancy went. There, if you, we submitted in our ERs the bulk of the trial lawyer's interview of the parents. It is one sheet with sparse notes. Had he asked, he would have found out that Mr. Jones, his, in utero was exposed to chrome, the mother was malnourished, she survived on caffeine and nicotine. These developmental indicators are, we have learned, are important. Dr. Stewart considered these when deciding the neurological deficiencies of Mr. Jones or the brain damage as well. This also puts a different spin on the head injuries. So not only do we have several head injuries, we also have a person that was in utero damaged neurologically. Also, the district court erroneously concluded that Dr. Stewart relied solely on the standardized testing that Mr. Jones, that Mr. Jones standardized testing in the eighth grade. And also, as the sole indicator of brain damage now, I would re-urge the court to re-read Mr. or Dr. Stewart's report where he really puts out the web of information as to how PTSD, ADHD, the mood disorder, the head injuries, the in utero poisoning, how everything affected Mr. Jones' cognitive dysfunction. In addition to that, there is, there is a, although we, although the mitigating evidence doesn't have to be connected, causally connected to the crime Tenard and this court, the Supreme Court in Tenard, and this court in Stiers and Lambright has held, there was a direct connection. Dr. Stewart made a direct connection with the baseball bat used at the time of the crime with at least two, possibly three life-threatening incidences that Mr. Jones endured when he was a child. The first being is he defended himself with a baseball bat to his grandfather at age, step-grandfather at age 13, and that's how the PTSD, or how the sexual abuse finally stopped. Okay. You're just under five minutes. You have that for rebuttal. Thank you for your argument. We'll hear from the State at this time. Mr. Zick. May it please the Court. My name is Jeff Zick. I'm an Assistant Attorney General in the Arizona Attorney General's Office. I represent Appalachia in this matter. What I would like to do is start out with this argument that Tenard v. Drecke somehow, or that the district court somehow did not consider mitigation evidence, and that somehow Arizona courts don't consider mitigation evidence. Because of the causal connection requirement or test that the court has stated. As this Court's well aware, Tenard v. Drecke and Smith v. Texas discuss the fact that sentencers, or triers of fact in capital cases, cannot be barred from considering relevant mitigation evidence. That a defendant has a right to present anything about his background, character, or history in order to argue for a sentence less than death. Causally connected or not. Causally connected or not. They cannot be barred from doing so. Counsel, do you concede that there was incompetence of counsel, and so what this case is all about is prejudice? I don't concede that there was incompetence of counsel. I do argue that this case deals with prejudice. As a district court found or analyzed this case. With respect to Arizona and Tenard v. Drecke, I would like to go back to Lockett v. Ohio, where the Supreme Court held Ohio's statute was unconstitutional and a violation of the Eighth Amendment because it barred a defendant from presenting mitigation evidence. In other words, the statute only allowed for certain mitigating factors to be presented. When the United States Supreme Court found that statute unconstitutional, Arizona also had that statute very similar to Ohio's. And the Arizona Supreme Court, in following Lockett v. Ohio, remanded a case, State v. Watson, and in that case, I think it was 12 or 13 cases were remanded for resentencing because of the unconstitutionality of that statute. State v. Watson is at 586 Pacific Second Amendment. Lockett v. Ohio is at 582 Pacific Second, 1253. So the Arizona Supreme Court has always followed Lockett v. Ohio, and cases after that, those cases that were remanded were remanded for resentencing because of that. In 1982, the United States Supreme Court decided Eddings v. Oklahoma. Arizona courts have always followed Eddings, and Eddings dealt with age as a mitigating factor, and that's a weighty or mitigating factor. It also said that age, the trier of fact, can put whatever weight is appropriate to age. So an individual who is much older than 16, say 35, that may not be a weighty factor. From there, the Arizona courts have evolved into what weight do you give the mitigating factors? And in 1999, in State v. CARE, that's where the language causal connection first came up, and it came up in a case with respect to mental health evidence. But the causal connection in Arizona does not bar the consideration of that evidence. It simply puts an effect or gives an effect to that evidence. So the court will look at this at the time when it was trial court sentencing in a capital case, will look at that evidence, consider the evidence, but if it's not connected, it's not going to be given much or any weight. So, for example --"What's the functional difference between barring the evidence and giving it no weight?" Well, the difference is the court considers it and can hear that evidence. The bar comes when a court or a trier of fact doesn't even hear the evidence. For example, in Tenard and Smith v. Texas, Texas had a system where certain evidence wasn't even going to be considered. So it couldn't even be weighed. In Arizona, the difference is it is considered. Not weighed at all. I mean, at least in your argument, you say that you can hear the evidence, but you are to give it no legal weight. There's no requirement that you don't give it weight. That's the individual sentencer that decides that. So, for example, if you had two defendants and both were diagnosed with, say, bipolar disorder, one defendant A was diagnosed with bipolar disorder but had evidence that at the time or just prior to the time of the crime he was in a manic or hypomanic state, but defendant B only had a diagnosis and evidence that he had bipolar disorder but no evidence whatsoever that he was in a manic or hypomanic state, but no evidence whatsoever that that bipolar disorder was affecting him in any way, defendant A is going to be given significant weight or his mitigating evidence will be given significant weight. That doesn't mean that defendant B, the court or the trier of fact, is not going to consider that evidence. Certainly it's considered. Let me ask you this, though. Under Arizona law, then, would a trial, assuming judge sentencing, would a trial court doing judge giving great weight to mitigating evidence that was not causally connected? No, I don't think there's any legal error there. In Arizona, the trier of fact who sits at sentencing is the one who decides what weight to give that evidence. There's no error in weighing that mitigating evidence. That's an individual sentencing decision. And now with the next person to you wants to give that weight, you give it whatever weight you feel it's necessary or due. Well, how do we determine whether there's a causal connection or not? You said in the situation where the bipolar person is manic, you would perhaps assume there's a causal connection? Well, I believe if you had a case like that, there would most likely be expert testimony to that fact. I mean, with a diagnosis of bipolar, and given information of the defendant prior to or at the time of the crime, expert testimony could say that, yes, the evidence shows that he was in a manic or hypomanic state. I think that's how the sentencer would view that evidence and weigh it appropriately. Well, let's bring it down to this case. Now, what is the evidence of causal connection here? He'd apparently been doing drugs that he was using every day in quite a large quantity. He was using alcohol, and these things all happened about the same time, and the other guy came and hit him with a baseball bat. Would not his state just necessarily be causally connected to what he did? Well, I think the trial court viewed that evidence and heard that evidence and found that at the time, by preponderance of the evidence, Mr. Jones was, in fact, intoxicated. However, the trial court, in listening to all the evidence, determined that it wasn't of any sufficient weight in order to warrant leniency. So the trial court did, in fact, consider this evidence and did find, by preponderance of the evidence. In Harris v. Alabama, the Supreme Court has said... Wasn't a matter of causal connection? It was just that he thought that somehow other factors weighed in more strongly? Well, I don't think the trial court, in its special verdict, indicated whether there was a causal connection between the alcohol or drugs that Mr. Jones was doing prior to or during the crime. So there is no finding of that causal connection. Causal connection usually comes up in mental health evidence. For example, with respect to this diagnosis of post-traumatic stress disorder that came up in the district court, that type of evidence is going to be looked at for what type of connection does that evidence have with this particular individual at the particular time. So that kind of finding wasn't there at the trial court, but the trial court did consider the evidence of alcohol and drug abuse and did find, by preponderance of the evidence, that Mr. Jones was, in fact, intoxicated at the time of the crime. But I think what this court needs to do is look at the evidence that was presented in district court in comparison to what was presented at trial. And what you see are maybe, perhaps, some detail added to what was presented at the trial court in 1993. But certainly... The second stepfather testified about the abuse that the first stepfather had put upon Mr. Jones, but didn't describe his own abuse of Jones. That's correct. And was there any evidence at the state trial proceeding of the stepgrandfather's abuse of Jones? No, there wasn't any evidence of that. And the use of drugs to, for lack of a better description, entice Jones into inappropriate sex acts? No, that evidence was developed years later. It was available to Jones at the time, Jones being the one who could tell his counsel about that, but also in conversations with Randy Jones and Peggy Jones, that information never came up. So there may be a little detail in that respect. But I think when you look at, in comparison, what was presented in the district court and what was presented at trial, there certainly is a lot of ambiguity of what was presented in district court. So if this case were to go back on remand for resentencing, the 1993 sentencing is much clearer and a better presentation than what was presented at trial. And that would have been added from the 2006 evidentiary hearing in district court, because of the inconsistencies of all of the testimony. And when you look at the experts who testified regarding post-traumatic stress disorder or other cognitive impairment, there is a lot of discussion about head injuries or other factors that are simply uncorroborated, that weren't developed, well, they could have been and there's no records to determine whether certain things happened. For example, the three car accidents that Mr. Jones indicated he was in and suffered unconsciousness, there was no records whatsoever regarding any of that. Are you saying it's ambiguous because there's no evidence of it in the first hearing and there's some evidence of it in the second? I mean, you said the record was cleaner and more persuasive, but there's no evidence in the first. Well, what I mean by more persuasive, and maybe I'm being inarticulate, more persuasive in the fact that if this new evidence were presented, there is so many inconsistencies and uncorroborated versions of what occurred that it is fertile ground for cross-examination. When you had the sentencing in 1993 and Dr. Potts testified regarding the seven areas of mitigating factors that he found, and in his opinion, Jones didn't warrant an aggravated sentence, that testimony went unrebutted. So the state did not rebut Dr. Potts' testimony. The state cross-examined Dr. Potts, but the state didn't present any expert testimony to refute anything that Dr. Potts said. Dr. Potts was an expert retained by the court, correct? That's correct. So he was an independent expert, which is something I would think that coming from an independent expert and not a defense expert, the court listened to. That leads to my next question, which is there came a point in Dr. Potts' examination at the state sentencing when Dr. Potts was asked about a particular type of neurological testing, of which I speak. Yes, the CAT scan, MRI, EEG. And was asked if that would be important, if he could determine, make a particular diagnosis in the absence of that testing. And I think his testimony was no. And he was then asked, if I remember correctly, would that be important in making a determination about these items? He said yes. And at that point, the defense attorney, whatever else you may say about his performance, stopped and asked the trial court for a continuance so that that testing could be undertaken. What do we make of that? Well, the evidence that Dr. Potts, and I believe my recollection may be slightly different. I think Dr. Potts had talked with Mr. Novak, Jones' trial counsel, regarding this type of evidence. And then Mr. Novak asked for the continuance, but then did it again after Dr. Potts had testified about that. When Dr. Potts testified, he indicated that it would be helpful to have the CAT scan, the MRI, the EEG, that type of neurological testing. But it wasn't to make the diagnosis, is my recollection. My recollection is Dr. Potts, he said that information would corroborate what he sees and what he found in his evaluation of Jones, which would be organic brain damage. So that's when Mr. Novak asked for the continuance to get that, and the trial court denied it. And what reason did the trial court give? The trial court gave that because Dr. Potts said that that information would corroborate what his opinion was about Jones' I read his testimony. He put it in terms of a hypothesis as to what he thought was wrong with Jones. But in order to really know, you had to do this other testing. So that it left it a bit tentative, and the district court or the trial court at that point could have thought, well, he's not really sure about that. That's an accurate reading of that testimony. Dr. Potts was talking about it would corroborate his evidence. I don't think he used the word corroboration. I think he said it would help him establish a definitive diagnosis, didn't he? I thought it was more corroboration, but I could be wrong. My recollection was, and I'm trying to look at my notes to see where I wrote that. This case has been pending a long time, and I think the evidence is very slim or nonexistent that the defendant has anything that requires any kind of neurological examination. That's what the trial court said. And that was in response to Dr. Potts' testimony. That he needed more information to make a definitive diagnosis or definitive conclusion. I think he said, I think it would be valuable to have some neurological evaluations, such as CAT scan, possibly an MRI, possibly some sophisticated neurological testing, because I think there's very strong evidence that, well, there's clear evidence that we have, I believe, of traumatic brain injury. That's another question. For those reasons you believe that further testing you described earlier would be just vital in this case, answer yes. Right. And then I think after that he talks about how it would help determine the etiology of what he sees. And for that reason, the trial court denied that motion. And I think there's an opportunity to develop that evidence in district court. And when you look at the evidence that was developed in district court, it certainly does not add to the sentencing calculus that the trial court did in 1993. At least that's our position. Because it was not, there was no organic brain damage that was done. When you look at the records that were presented in district court, and even the records that were presented in the trial court in 1993, for example, the 1983 trial where there was a brain injury accident when Mr. Jones was in the Marines, there's nothing indicating that he suffered any cognitive impairment or dysfunction as a result of whether it's alcohol intoxication or the small abrasion that was found on his head. There's just nothing there. And when you look at over the records through the years, there's nothing indicating that he had any type of cognitive dysfunction. In fact Dr. Stewart had checked in and there was also a fellow from the state school system that said he was two to four years behind where he should be in his cognitive development. Well, right. And that came from his eighth grade school records that I believe indicated that he was two, the grade equivalent, which is I think an equivalency test, determined that he was in the sixth grade level. Well, they said two to four years behind is what the testimony was there. What about the fact that he possibly, under Aki, should have had an independent expert of his own, psychiatrist? Well, I think had he requested one, the trial court, well, early, he probably would have gotten one. But he had an expert who was independent at the time. I know it was court-appointed, but this expert provided... Aki says it has to be his psychiatrist, not one that represents the state or that represents the court. Right. It has to be his. And he didn't provide any information to the trial court to get that type of expert. Well, then why don't we have concession of incompetence counsel? Because there wasn't you don't have to reach deficient performance in order to decide this case, much like the district court did. No, but I guess the question is what's your position now? Because I gather from your prior comments you don't think he was deficient or else you think he made strategic decisions. Well, I think Mr. Novak, if you look at the history of this case, and what I mean by that is Mr. Novak's testimony at the state post-conviction relief evidentiary hearing and his testimony in the district court, a couple examples. Mr. Novak testified that his defense has changed during this case. Because at the beginning of the case or near the beginning of the case, Mr. Jones had admitted to him that he killed Tisha Weaver. His defense at that point was trying to get a possible plea deal for Mr. Jones. About a month before trial, Jones changed his defense, and there was investigation into whether another individual, Frank Sperlazzo, committed the murder of Tisha. Mr. Novak did testify that he was in contact with the family. That Ms. Carty, who was his second chair counsel at the time, was also in contact with the family. That he was providing records or getting records, for example, the Washoe County medical records. He was in contact with people at Delancey Street and other drug rehab facilities. Had conversations with an individual who was a former counselor of Mr. Jones. But determined that he would not make a good witness. In fact, he got a written letter from him that was of no use, according to Mr. Novak. So there was investigation going on. With respect, I will concede that Mr. Novak did testify that he was unaware at the time that head injuries may lead to neurological type of evidence that could be presented. I do concede that. That's right in the transcript. He says that. Do I think it prejudiced Jones in this case? No, because he did have a hearing in district court where he was able to present this evidence. Whether that's a concession on deficient performance, you know, that is what Mr. Novak said. Would I concede that he had the type of deficient performance that this court has seen in cases like Correll and Lambright? No, I wouldn't concede that, because he did provide investigation. He did actually provide records to Dr. Potts for Dr. Potts to review and to testify about, to come to his opinion. He was asked why he didn't ask for more funds, and he says, I thought the judge wouldn't give it to me. Well, he was asked, right. He asked for, I believe, $5,000 from the court and was granted $2,000. And he did get an addictionologist to testify in the guilt phase, which did show some mitigation. In fact, the addictionologist said that Mr. Jones, at the time of the crime, was under the influence of drugs to the point where he wouldn't know whether what he was doing was right or wrong. It went to premeditation, which at the time in Arizona, you could show voluntary intoxication to negate premeditation. So that information did come out, and the trial court was able to use that as mitigation, because it was the same trial judge that sat through the trial and the sentencing and the PCR. Right, but I think the answer that I was afraid the judge would say no is not a very good strategic reason for not asking, if you're headed in that direction. No, I'm not. You can't defend that. No. And your basic defense is it didn't make any difference. I think there's no question in reading his testimony, he would have done things much differently in hindsight than he did at the time. I mean, I think if he had to judge his own performance, he would say it was deficient. He did testify to that. I mean, I just haven't seen a case where in the middle of an examination, the defense counsel has an epiphany and said, well, I think I need to do more testing, like this one, where he said neurologic testing. I mean, you're in the sentencing phase of this trial. That's quite a startling, as Judge Hawkins said, it was good of him to ask at that point, but it's a bit of a startling read for me to say in the middle of it, he realizes in the middle of an expert examination that he needs to do more testing. And that's what Mr. Novak testified to. And I can't dispute that, and I won't dispute that, but the fact is that because of that, the district court gave a hearing where Jones was able to develop this mitigation evidence, and when he developed the information, when you compare it side by side, the sentencing, and the district court found this, the sentencing in 1993 was a much clearer picture than what would have been had the 2006 information been presented. If the court has no further questions, I'll... I don't see any. Thank you very much for coming in today. We appreciate your argument. Thank you. You have about four, almost five minutes for rebuttal, counsel. Thank you, Your Honor. I'd just like to make a couple points. First, I'd like to make sure that the court, to point the court to ER1112, and we talked a lot at the evidentiary hearing about the eighth grade standardized testing. There is also sixth grade standardized testing that puts Mr. Jones, who at grade equivalent of second grade in math and grade equivalent of 1.9 grade in reading, and this was around age 9, 10, 11, and so that undercuts the state's argument that the problems he was having in school were due to his drug use at around age 13. Is there any evidence in the record that suggests that the defendant, Jones, objected to the presentation of mitigation evidence or didn't want any mitigation evidence put on? No, there isn't. There is no evidence of that. But the state does argue that the information was available on Mr. regarding the step, Randy Jones, the second stepfather and the stepgrandfather. The ABA guidelines and Wiggins and Rompia and other cases have talked in terms of the importance of starting the mitigation investigation early and having, building the relationship with the family and the client so that this information comes to light. There was indication in the pre-sentence report that Mr. Jones told the pre-sentence writer in this particular case that his second stepfather abused him. Once it was in the middle of the sentencing, everybody dismissed it as a mistake. So Mr. Jones did tell the pre-sentence writer in this case at least about the second stepfather's abuse. The attorney general here says that the state never refuted Dr. Potts' testimony at sentencing. That is not the case. In fact, during Dr. Potts' testimony during sentencing, because he was defense-friendly or giving information that helped Mr. Jones, the prosecutor in that case cross-examined him regarding the fact that he did not have enough.  I think what counsel said is that the state did not put on affirmative evidence, and I think that's quite correct. They didn't rebut with an expert. The state didn't rebut with an expert of its own. Dr. Potts was cross-examined at sentencing in the state court, right? Right, he was. And by my reading of it, did a pretty good job responding to the questions that were fired at him. He did, he stood firm and did explain that, you know, he identified these issues, but also said that he needed this additional testing. Now, in the district court he explained the state tried to pigeonhole him by saying that it was really MRIs or PET scans that he was really looking at, but Dr. Potts testified, well, it was neurological testing of some sort. And MRIs may not have picked up this particular brain damage. And so just because I said that, it doesn't mean that, you know, that's the only thing I thought would help me with this diagnosis. But the sentencing court did find essentially that there was head trauma as a mitigating factor. So in essence, the additional neurologic testing to the extent it confirmed head trauma might have been cumulative to the ultimate finding of the trial court. Well, and that goes back to the points we were discussing earlier where it's not the quality and quantity of head trauma that we explained should have been presented in these cases. The state talks that we believe that the court has enough in front of it to find deficient performance in this case. Is that our duty in the first instance, that the district court went to strickland prejudice, which the district court is perfectly entitled to do, but if we decide that, in fact, there was enough to establish strickland prejudice, isn't the best course to remand and allow the district court to determine whether there's a strickland violation in the first instance? Well, it isn't the first instance. I mean, the PCR court, the trial court, had an evidentiary hearing on here, and those facts were developed there. And then the district court, although didn't make a ruling on that, certainly didn't limit our hearing to that. And so the district court had an opportunity to decide deficient performance, and it didn't. And so I do feel that it is this court's duty, if it has enough record in front of it, to decide deficient performance. We request that this court remand this case back to the district court in order to issue the writ and be sent back to the Mojave Superior Court for resentencing. Okay. Thank both counsel for their arguments. The case just argued will be submitted for decision, and the court will stand in recess for the afternoon.
judges: Fletcher B. , Hawkins, Thomas